UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

In re:                                          Chapter 11

MICROMED TECHNOLOGY, INC.,                      Case No.  13-11525 (PJW)
a Delaware corporation,

                          Debtor.

**MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING MICROMED TECHNOLOGY TO ENTER INTO A MANAGEMENT AGREEMENT WITH RELIANTHEART, INC.**

MicroMed Technology, Inc. ("MMT") moves the Court under Bankruptcy Code Sections 105, 363 and Bankruptcy Rules 6004 and 9014 for the entry of  Interim and Final Orders in the form attached hereto as **Exhibit A** authorizing MMT to enter into a management agreement with ReliantHeart, Inc ("ReliantHeart") relating  MMT's assets and operations.  This Motion is supported by the Affidavit of Dennis L. Winans ("Winans Aff.") filed today.

### Status of the Case and Jurisdiction

1.      MMT commenced a bankruptcy case today by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      MMT has continued in possession of its properties and is operating and managing its business as a debtor-in-possession under Bankruptcy Code §§ 1107(a) and 1108.

3.      No request has been made for the appointment of a trustee or examiner and a creditor's committee has not yet been appointed.

4.      This Court has jurisdiction to hear this motion under 28 U.S.C. §§ 157 and 1334. Venue is proper in this District under 28 U.S.C. § 1408.  This is a core proceeding under 28 U.S.C. § 157(b)(M).

**Background**

A.      **MMT's Lifesaving Product Is At A Critical Stage of Development**

5.      In 1984. Drs. Michael DeBakey and George Noon performed heart transplant surgery on a NASA-Johnson Space Center engineer following a severe heart attack.   That engineer returned to work six months later with the desire to apply spacecraft technology to help people with diseased hearts.   Subsequently, NASA engineers and Drs. DeBakey and Noon discussed the design of a low-cost, low-power,  implantable ventricular assist device ("VAD"). VADs assist the heart to pump blood in individuals with heart disease.

6.      Over the years, MMT continued to develop this elusive yet potentially sensational technology, including obtaining an exclusive license from NASA in 1996 to use a rotary blood pump for cardiovascular applications.  MMT's technology  is the culmination of decades of development of the VAD.

7.      In 2009, MMT made the strategic decision to address side effects encountered by existing approved devices through developing the next generation left ventricular assist device ("LVAD") – the HeartAssist5®.  This system is the culmination of everything learned from over 450 implants worldwide, together with the collaboration of countless leading experts in the field of Mechanical Circulatory Support.

8.      HeartAssist5® helps improve circulation in patients with advanced heart disease, which gives patients a much-improved quality of life as they await heart transplants.

9.      The HeartAssist5® System received CE Mark Approval Certification in May 2009, an important certification that allowed the HeartAssist5® System to be sold and implanted in certified centers across Europe.

10.     MMT's world headquarters and  certified manufacturing facility is located in Houston, Texas.

3542713.1

11.     MMT owns several patents for HeartAssist5®. HeartAssist5® is the only electric heart pump that has a remote monitoring system, which includes the Conquest Controller and Remote Monitoring System. That system saves lives and money, and is pictured below.



12.     To date, MMT has developed the HeartAssist5®, Conquest Controller, and Remote Monitoring System to a point of critical development.

13.     In June 2012, MicroMed received approval from the U.S. Food and Drug Administration (FDA) to conduct an Investigational Device Exemption (IDE) Clinical Trial study of the HeartAssist5® LVAD System compared to one of its competitors, the HeartMate II® VAD, which is made by a company called Thoratec.

14.     The lengthy development and testing period drained MMT of cash and it ceased operations in October, 2012.

15.     However, two employees continued to work to maintain the technology. A reliability life testing lab "Loop Room" was kept operating in Houston to evidence the reliability of the HeartAssist5® over time in order to demonstrate the technology for ongoing government testing and approvals. However, with MMT out of money, MMT was unable to pay it employees for much of their work after October, 2012, and those employees are not willing to continue to work indefinitely without pay, or prospect of being paid.

**B.      MMT's Capitalization.**

16.     MicroMed Cardiovascular, Inc. ("MMC") was the sole owner of MMT until April 24, 2013.

17.     MMT has about $2.3 million in inventory (book value after removing obsolete inventory) for production and maintenance of HeartAssist5® devices, and about $142,924 in depreciated book value of its leasehold improvements and FF&E, primarily at its Houston location.  It owes about $3.175 million in supplier and other accounts payable; $649,517 in insider loans; and $174,946 in pre-petition wages and related employee claims.

18.     Prior to the Bridge Notes discussed below, MMT and MMC were capitalized with about $27 million from 2008 to mid-2011.  When added to development cost and investment in regulatory approval, the total investment in MMC, MMT, and their predecessors since inception in the mid-1990s is in excess of $130,000,000.

19.     MMC is the maker of certain Convertible Bridge Note(s) dated September 14, 2011 made to the order of the lender pursuant to certain Note Purchase Agreements dated September 14, 2011 between MMC and each lender.  Thirty-one Bridge Notes were made; and as of April 2013 the unpaid balance of principal was $3,752,323.  Seventy-four percent of the Bridge Note Holders are holders of the common and Series A shares of MMC.

20.     Repayment of each Bridge Note was secured by a lien evidenced by a General Business Security Agreement made by MMC.  The lien essentially extends to all assets of MMC.  The lien granted to each Bridge Note holder was of the same priority as the lien granted to all other Bridge Note holders.

21.     The Bridge Notes are in default.

22.     The MMC Board sought to have the Bridge Note holders take control of their collateral for the purpose of maximizing their recovery.  On April 24, 2013, two Bridge Note holders - Bryan Lynch and Anthony Williams foreclosed their security interests in MMC's assets, credit bid their debts, and assigned the assets to an entity called BTVAD, LLC ("BTVAD").  Lynch and Williams had formed BTVAD.  As a result of the foreclosure, BTVAD is now the owner of MMC's assets for the benefit of the Bridge Note Holders.

23.     Prior to this bankruptcy filing, BTVAD has loaned MMT $100,000 in what was to be a secured financing.  A security agreement was signed by MMT that was intended to secure the financing by a lien on all assets of MMT.  However, the UCC-1 was not filed.  In addition, MMT had incurred unsecured debt to BTVAD in the amount of $275,439.

### C.     Going Concern Prospects.

24.     There are two main competitors to the HeartAssist5® technology.  Based upon statements of one Bridge Note holder, MMT believes that one of its two competitors would be willing to pay perhaps $1.1 million for the technology, leaving perhaps $300,000 more or less in liquidation value of MMT's other assets. MMT management does not believe that such a sale would be fair to MMT (or MMC) creditors and stockholders.   MMT seeks a reorganization that is feasible and has the potential for greater return to MMT's constituencies.

25.     The ability to sell the device in Europe has value, but even more valuable is the opportunity from the FDA to conduct an Investigational Device Exemption (IDE) Clinical Trial study of the HeartAssist5® LVAD System compared to the HeartMate II® VAD.

26.     The first leg of this trial will involve completing devices for implantation in patients in Houston and intensive monitoring of the devices and patients during the trial.  The IDE allows the HeartAssist5® system to be sold for use in a clinical trial approved by the FDA to collect safety and effectiveness data before it grants a license to market HeartAssist5® commercially.  This license is known as a Premarket Approval ("PMA") of the product.  The IDE route is the same pathway used by the two main competitors- Thoratec's HeartMate II and HeartWare's HVAD.  Management anticipates obtaining a PMA may result in MMT or its successor becoming a going concern.

27.     In addition to the funding from BTVAD, it is necessary to raise between $10,000,000 and $15,000,000 to gear up for sales in Europe, begin the first leg of the FDA trial to bring HeartAssist5® to the market in the United States, to pay vendors for development and regulatory agency support, and fund a plan of reorganization for MMT.

6538796/

5

3542713.1

28.     MMT lacks the capital to bring its technology forward, and its financial difficulties make its reputation a negative in the market.  As a consequence, subject to director recommendation and stockholder approval, MMT intends to sell all of its assets to ReliantHeart, a Delaware corporation, through a plan of reorganization.

29.     Prior to the April 2013 foreclosure, BTVAD formed ReliantHeart.  During the week of May 27, Rodger Ford, Bryan E. Lynch, Sailesh Saxena, Anthony Williams and Cindy McKelroy became the founding shareholders of ReliantHeart.  Each are insiders of MMC or MMT.

30.     When MMT could not pay its past due rent, and discussions between a Bridge Note holder and the landlord fell through, ReliantHeart stepped in, assumed the lease as of April 10, 2013, and worked out an agreement to pay the arrearages.

31.     MMT contemplates that its plan of reorganization will provide that ReliantHeart will assume its technology agreements and cure defaults, and MMT will assign all rights to ReliantHeart.  ReliantHeart will pay cash to MMT's creditors and distribute a portion of its stock to MMT shareholders.  It is initially expected that unsecured creditors will be paid in full, without interest, over 5 years in agreed upon installments.  Bridge Note Holders will collectively be paid $1,100,000 by ReliantHeart, with each holder having the option to convert the debt into equity.  ReliantHeart will raise funds via conversion of the BTVAD loan to equity and an offering to the Bridge Note Holders (the stockholders of MMT), then to MMC shareholders.  If shares remain unsold, they will be offered to new investors.

32.     Through discussions held among Messrs. Lynch,  Williams,  Ford and numerous Bridge Note Holders, it has been determined on an informal basis that a majority of the Bridge Note Holders favor a plan to retain the value of the MMT assets (rather than liquidate), pay MMT's obligations, and capitalize the business in the hope of moving the technology forward and salvaging, to some extent, the investment in MMC and MMT.

33.     During the pendency of the bankruptcy, MMT needs the HeartAssist5®
technology to be protected and preserved through the resumption of business operations,
maintenance of the "Loop Room," manufacture, testing and maintenance of LVAD devices,
commencement of the FDA trial, ongoing payment of employees and vendors, and monitoring of
patients on a continuous, ongoing basis.  ReliantHeart has agreed to do so, at its own expense,
and to pay MMT a monthly fee.  ReliantHeart will begin the process of obtaining European and
FDA approval for the transfer of approvals from MMT to ReliantHeart (which usually takes 45
days).  In the event of termination, or if ReliantHeart does not purchase MMT's assets pursuant
to a confirmed plan of reorganization, ReliantHeart will return all of MMT's rights and
remaining assets (ordinary disposition excepted) without lien, claim or offset.

34.     The understandings are reflected in the proposed Management Agreement that
MMT seeks approval of under Bankruptcy Code § 363(b)(1).  A copy of the Management
Agreement is attached hereto as **Exhibit B**.

35.     Approval of the Management Agreement and the additional funds that
ReliantHeart intends to raise are necessary to recapitalize the business and get it past the hurdles
it faces to bring HeartAssist5® to the market.  Without fresh capital and the ReliantHeart
transaction, MMT will have to shut down operations and its valuable technology will likely not
be developed.

36.     The alternative for MMT would be to obtain debtor in possession funding, re-
employ its employees, and re-start business operations.  All of the expense would be incurred by
MMT and, effectively, its creditors.  ReliantHeart could not commence using the technology
until consummation of a confirmed plan of reorganization.

37.     In contrast, under the proposed Management Agreement, ReliantHeart incurs the
expense and financing costs of re-employing the employees and re-starting the business.
ReliantHeart pays $50,000 per month to cover the expenses of the administration of the case.

Even if the transaction does not occur because of an overbid, or otherwise, ReliantHeart is not owed any break-up fee or expense reimbursement.

38.    With these conditions, the proposed Management Agreement provides MMT with a low-risk, low-cost way to attempt to preserve its going concern value for the benefit of creditors and stockholders.

**D.    Material Terms of the Management Agreement**

39.    The Management agreement requires ReliantHeart to:

- Pay MMT $50,000 per month.

- Employ and pay MMT's employees.

- Take all steps reasonably necessary to continue MMT's business.

- Protect MMT's intellectual property, including payment of costs associated with the IP.

- Fulfill MMT's obligations under the assigned lease with SL Interchange LP.

- Provide for MMT's utility services;

- Maintain MMT's furniture, fixtures, and equipment.

- Use and replace MMT's inventory to produce, repair, or replace the HeartAssist5® system.

- Pay all taxes.

- Maintain appropriate insurance coverage.

- Pay all other expenses of operating MMT's business.

- Ensure that MMT's property is free and clear of liens.

- Ensure that MMT is able to remain in compliance with the Bankruptcy Code and applicable rules, including fulfilling all reporting requirements.

- Keep information obtained from MMT confidential.

- Maintain books and records.

- Indemnify MMT from ReliantHeart's gross negligence, fraud, or willful misconduct.

- Refrain from conducting any business other than operating MMT's business.

## Relief Sought

40.    MMT requests that the Court (1) enter an interim order authorizing MMT to enter into the Management Agreement attached hereto as Exhibit B, (2) scheduling a final hearing, and (3) entering a final order authorizing MMT to enter into the Management Agreement.

## Argument

### A.    The Court Should Authorize MMT to License Its Technology to ReliantHeart, Inc.

41.    Section 363(b)(1) permits the court to authorize the Debtor to "use, sell, or lease" property of the estate other than in the ordinary course of business.

42.    A management agreement is not a lease, but the two are similar.  And a management agreement is likely a "use" of property, so Section 363(b)(1) should apply here.[1]

43.    The standard for approving the use of property outside the ordinary course of business is whether the transaction is an exercise of the debtor's business judgment.[2]  "Courts

---

[1] *See* 3 *Collier on Bankruptcy* ¶ 363.02, at 363-11 (16th ed. 2013) ("Section 363(b) has been applied to other uses that one might not ordinarily posit as a question of use of property, but rather as entering into transactions out of the ordinary course of business.").

[2] *See In re ASARCO, LLC*, 650 F.3d 593, 601 (5th Cir. 2011) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard."); *In re Elpida Memory, Inc.*, 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012); *In re Borders Group, Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011).  "Courts should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross-negligence.'"

should not generally interfere with business decisions absent a showing of 'bad faith, self-interest, or gross-negligence.'"[3]

44.     Here, whether the Management Agreement is a "lease" or "use" of property of the estate, it is an extremely favorable arrangement for MMT.  The management agreement is a valid exercise of MMT's business judgment because it presents little risk to MMT and will permit MMT to reboot its operations in earnest without the need to obtain a DIP loan.  ReliantHeart will pay MMT $50,000 a month for the privilege of restarting the business and moving it to the next level.

45.     If the sale to ReliantHeart occurs, creditors will be paid over time and those who invested in MMT and MMC will be given the opportunity to participate in ReliantHeart's venture.  And if the sale to ReliantHeart does not occur, MMT is not obligated to repay anything to ReliantHeart.  In the unfortunate event of a liquidation down the road, the value of the estate would be either the same, or greater than it is now.  The Management Agreement presents little, if any, downside to MMT, creditors, or shareholders and the Court should approve it.

**B.      Approval of the Management Agreement on an Interim Basis Is Necessary to Prevent Immediate and Irreparable Harm.**

46.     The Management Agreement is not a DIP loan, but the need for an interim order approving the Management Agreement is the same as with DIP financing — if the ReliantHeart Management Agreement is not approved, MMT has no resources with which to continue the business, including paying rent, paying employees and continuing its trials.  Accordingly, much of the progress MMT has made to develop its technology may be lost, and MMT will have to liquidate.  The Court should therefore apply Bankruptcy Rule 4001(c) by analogy.  Bankruptcy Rule 4001(c) provides that a final hearing (the "Final Hearing") to obtain credit pursuant to § 364 may not be commenced earlier than fourteen days after the service of such motion.  Upon

---

[3] *See Borders*, 453 B.R. at 482 (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)).

request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the debtor to obtain credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Fed. R. Bankr. P. 4001(c)(2).

47.      Accordingly, MMT requests that the Court conduct an expedited preliminary hearing on this Motion in order to (a) assist in its restructuring efforts and pay for operating expenses; and (b) avoid the immediate and irreparable harm and prejudice to the MMT's estate and all parties in interest that would otherwise ensue.

48.      Under Bankruptcy Rules 4001(c)(2) and Local Rule 4001-2(c), MMT requests that the Court set a date for the final hearing that is as soon as practicable and set a deadline for objections to this Motion.

## Conclusion

49.      In consideration of the foregoing, MMT requests that the Court enter an interim order substantially in the form of **Exhibit A**, schedule a final hearing, enter a final order, and grant such other relief as the Court deems appropriate.

*[Signature page follows.]*

6538796/

11

3542713.1

Date: June 13, 2013                          **MORRIS JAMES LLP**

                                             /s/ Brett D. Fallon
                                             Brett D. Fallon (DE Bar No. 2480)
                                             500 Delaware Avenue, Suite 1500
                                             P.O. Box 2306
                                             Wilmington, Delaware  19899-2306
                                             Telephone:  (302) 888-6800
                                             Facsimile:  (302) 571-1750
                                             E-mail:  bfallon@morrisjames.com

                                                     and

                                             Robert M. Charles, Jr. (AZ SBN 007359)
                                             Justin J. Henderson (AZ SBN 026930)
                                             Lewis and Roca LLP
                                             One South Church Avenue
                                             Suite 700
                                             Tucson, AZ 85701
                                             Telephone:  (520) 629-4427
                                             Facsimile:  (520) 879-4705
                                             E-mail:  RCharles@LRLaw.com
                                             E-mail:  JHenderson@LRLaw.com

                                             *Proposed Counsel for the Debtor and
                                             Debtor in Possession*

6538796/

3542713.1