# EXHIBIT B

Consent of Sole Director In Lieu of Meeting
MicroMed Technology, Inc., a Delaware corporation

The undersigned comprises the sole director of MicroMed Technology, Inc. (the "Corporation") and consents to the following pursuant to Section 3.11 of the Corporation's bylaws as of June 13, 2013.

The undersigned waives any and all notices that may be required to be given with respect to a meeting of the directors of the Corporation and, in lieu of holding a meeting of the directors, do hereby unanimously adopt by written consent the following resolution and actions pursuant to Section 141(f) of the Delaware General Corporation Law, as amended, and the Bylaws of the Corporation. A copy of this consent shall be filed with the minutes of the board of directors of the Corporation. This consent shall become effective as of the date set forth above.

## Background

The Corporation is in preparation for financial reorganization and lacks the resources to operate its business or reorganize without significant financial support. For the reasons stated in the Background section of the attached Management Agreement, the best alternative for the Corporation is to enter into a Management Agreement with ReliantHeart, Inc., a Delaware corporation.

## Consent

The Corporation is authorized to enter into the Management Agreement with ReliantHeart, Inc. in the form attached and incorporated herein as Exhibit A, subject to Bankruptcy Court approval.

*Dennis L. Winans*
Dennis L. Winans
Dated June 13, 2013

*Management Agreement*

**Parties.** This Management Agreement is made on June ___, 2013 between MicroMed Technology, Inc., a Delaware corporation ("MMT") and ReliantHeart, Inc., a Delaware corporation ("ReliantHeart").

**Background**

A.   MMT and its affiliate MicroMed Cardiovascular, Inc., a Delaware corporation ("MMC") (together with MMT, herein "MicroMed") have over the years developed the HeartAssist5® System, which received CE Mark Approval Certification in May 2009 and is currently being implanted in certified centers across Europe.

B.   In June 2012, MicroMed received approval from the U.S. Food and Drug Administration (FDA) to conduct an Investigational Device Exemption (IDE) Clinical Trial study of the HeartAssist5® LVAD System compared to the HeartMate II® VAD.

C.   MicroMed's world headquarters and its EN ISO 13485:2003/AC:2007 certified manufacturing facility is located in Houston, Texas. MicroMed has a consultant, First Clintech, based in Uden, Netherlands.

D.   MMC has made certain patent applications, as follows:

| No. | Title | Patent Number | Type of Document | Application Date |
|---|---|---|---|---|
| 1. | Wireless heart pump control system for pediatric application, has motor controller to transmit digital representations of pump motor operating parameters to monitor module through bi-directional radio frequency link | 1812094 | Derwent World Patents Legal | 08/17/2011 |
| 2. | REMOTE DATA MONITOR FOR HEART PUMP SYSTEM | 1812094 | European Patent Organization International Patents | 08/17/2011 |

E.   MMC is the assignee of certain patent rights:

| No. | Assignee | Assignor | Patent Number(s) | Type of Document | Assignment Date |
|---|---|---|---|---|---|
| 1. | MICROMED CARDIOVASCULAR, INC. | BENKOWSKI, SCHIMA, MORELLO, GINO, ROBERT, VOLLKRON, HEINRICH, MICHAEL | 8303482, 20090005632 | Assignment | 09/09/2008 |

F.     Micro Med Technology ("MMT") has applied for patents, as follows:

| No. | Title | Patent Number | Type of Document | Application Date |
|---|---|---|---|---|
| 1. | PUMP CLEAN-OUT SYSTEM | 20130042892 | US Patent Application | 02/21/2013 |
| 2. | System for cleaning implanted blood pump, has outflow tube which is coupled to valve assembly, and outflow catheter which is provided with expandable outflow element positioned about periphery of outflow catheter | 20130042892 | Derwent World Patents Legal | 02/21/2013 |
| 3. | DEVICE, METHOD, AND SYSTEM FOR CALIBRATION OF A FLOW METER USED IN CONJUNCTION WITH A VENTRICULAR ASSIST DEVICE | 20110093230 | US Patent Application | 04/21/2011 |
| 4. | Blood flow calibration system i.e. blood flow meter programming system, has flow system allowing computer to determine calibration data, and programmer transferring calibration data from computer to memory of flow meter | 20110093230 | Derwent World Patents Legal | 04/21/2011 |
| 5. | DEVICE, METHOD, AND SYSTEM FOR CALIBRATION OF A FLOW METER USED IN CONJUNCTION WITH A VENTRICULAR ASSIST DEVICE | 2254618 | European Patent Organization International Patents | 12/01/2010 |
| 6. | Blood flow calibration system i.e. blood flow meter programming system, has flow system allowing computer to determine calibration data, and programmer transferring calibration data from computer to memory of flow meter | 2254618 | Derwent World Patents Legal | 12/01/2010 |
| 7. | Detecting ventricular collapse in patient with implanted blood pump by sampling pump current, speed or flow rate to calculate suction probability index | 1469770 | Derwent World Patents Legal | 10/27/2010 |
| 8. | METHOD AND SYSTEM FOR DETECTING VENTRICULAR COLLAPSE | 1469770 | European Patent Organization International Patents | 10/27/2010 |
| 9. | Controlling implanted blood pump by changing pump speed according to change in diastolic pump flow rate and heart rate | 101816811 | Derwent World Patents Legal | 09/01/2010 |
| 10. | Pump system | 101816811 | China International Patents | 09/01/2010 |
| 11. | Implantable blood pump system such as ventricle assist device (VAD) system has processing device programmed to determine flow rate based on pump parameters and compare determined flow rate to measured flow rate | 20100130809 | Derwent World Patents Legal | 05/27/2010 |
| 12. | BLOOD PUMP SYSTEM | 20100130809 | US Patent Application | 05/27/2010 |
| 13. | Implantable blood pump system such as ventricle assist device (VAD) system has processing device programmed to determine flow rate based on pump parameters and compare determined flow rate to measured flow rate | 101678160 | Derwent World Patents Legal | 03/24/2010 |
| 14. | Blood pump system | 101678160 | China International Patents | 03/24/2010 |
| 15. | Implantable blood pump system such as ventricle assist device (VAD) system has processing device programmed to determine flow rate based on pump parameters and compare determined flow rate to measured flow rate | 200906510 | Derwent World Patents Legal | 02/26/2010 |
| 16. | BLOOD PUMP SYSTEM | 2136861 | European Patent Organization International Patents | 12/30/2009 |
| 17. | Implantable blood pump system such as ventricle assist device (VAD) system has processing device programmed to determine flow rate based on pump parameters and compare determined flow rate to measured flow rate | 2136861 | Derwent World Patents Legal | 12/30/2009 |
| 18. | REMOTE DATA MONITOR FOR HEART PUMP SYSTEM | 20090226328 | US Patent Application | 09/10/2009 |
| 19. | Wireless heart pump control system for pediatric application, has motor controller to transmit digital representations of pump motor operating parameters to monitor module through bi-directional radio frequency link | 20090226328 | Derwent World Patents Legal | 09/10/2009 |
| 20. | Blood flow calibration system i.e. blood flow meter programming system, has flow system allowing computer to determine calibration data, and programmer transferring calibration data from computer to memory of flow meter | 20090192749 | Derwent World Patents Legal | 07/30/2009 |
| 21. | DEVICE, METHOD, AND SYSTEM FOR CALIBRATION OF A FLOW METER USED IN CONJUNCTION WITH A VENTRICULAR ASSIST DEVICE | 20090192749 | US Patent Application | 07/30/2009 |

| No. | Title | Patent Number | Source | Date |
|---|---|---|---|---|
| 22. | ARTIFICIAL HEART SYSTEM | 20090156885 | US Patent Application | 06/18/2009 |
| 23. | Heart pump system for total artificial heart system, comprises controller that operates blood pumps in master or slave configuration | 20090156885 | Derwent World Patents Legal | 06/18/2009 |
| 24. | ROTARY BLOOD PUMP | 20090143635 | US Patent Application | 06/04/2009 |
| 25. | Rotary blood pump i.e. left ventricular assist device, has flow straightener assembly formed with body contour such that rear section of straightener body blends into shaft without forming axial gap between end of straightener and front hub | 20090143635 | Derwent World Patents Legal | 06/04/2009 |
| 26. | BLOOD PUMP SYSTEM AND METHOD OF OPERATION | 20080281146 | US Patent Application | 11/13/2008 |
| 27. | Blood pump system e.g. ventricle assist device system, controlling method for recovered heart patient, involves controlling pump in response to flow waveform in time and frequency domains and maintaining desired flow rate | 20080281146 | Derwent World Patents Legal | 11/13/2008 |
| 28. | Implantable blood pump system such as ventricle assist device (VAD) system has processing device programmed to determine flow rate based on pump parameters and compare determined flow rate to measured flow rate | 2008237136 | Derwent World Patents Legal | 10/16/2008 |
| 29. | Implantable rotary blood pump e.g. for assisting pumping of human heart | 1 | Derwent World Patents Legal | 04/23/2008 |

G.   MMT is the assignee of certain patents, as follows:

| No. | Assignee | Assignor | Patent Number(s) | Type of Document | Assignment Date |
|---|---|---|---|---|---|
| 1. | MICROMED TECHNOLOGY, INC. | BENKOWSKI, ROBERT J., HUDSON | 20090143635, 8376926 | Assignment | 11/02/2012 |
| 2. | MICROMED TECHNOLOGY, INC. | BRYAN, ROBERT, BENKOWSKI, MORELLO, GINO, LYNCH | 8190390, 20110093230 | Assignment | 11/11/2010 |
| 3. | MICROMED TECHNOLOGY, INC. | MORELLO, GINO F. | 7951062 | Assignment | 07/23/2010 |
| 4. | MICROMED TECHNOLOGY, INC. | MORELLO, GINO F. | 20090226328 | Assignment | 07/23/2010 |
| 5. | MICROMED TECHNOLOGY, INC. | MORELLO, GINO F | 20100130809 | Assignment | 01/12/2010 |
| 6. | MICROMED TECHNOLOGY, INC. | ROBERT, MORELLO, GINO, BENKOWSKI | 8323173, 20050131271 | Assignment | 08/21/2009 |
| 7. | MICROMED TECHNOLOGY, INC. | BENKOWSKI, ROBERT, LYNCH, BRYAN, MORELLO, GINO | 7856335 | Assignment | 02/11/2009 |
| 8. | MICROMED TECHNOLOGY, INC. | MORELLO, GINO, BENKOWSKI, ROBERT | 20090156885 | Assignment | 07/16/2008 |

H.      MMT owns certain patents, as follows:

3509722.5

| No. | Title | Patent Number | Type of Document | Granted To | Issued Date |
|---|---|---|---|---|---|
| 1. | Rotary blood pump i.e. left ventricular assist device, has flow straightener assembly formed with body contour such that rear section of straightener body blends into shaft without forming axial gap between end of straightener and front hub | 8376926 | Derwent World Patents Legal | MICROMED TECHNOLOGY INC | 02/19/2013 |
| 2. | ROTARY BLOOD PUMP | 8376926 | US Granted Patent | MICROMED TECHNOLOGY, INC. | 02/19/2013 |
| 3. | Controlling implanted blood pump by changing pump speed according to change in diastolic pump flow rate and heart rate | 8323173 | Derwent World Patents Legal | MORELLO, GINO F, BENKOWSKI, ROBERT J, MICROMED TECHNOLOGY INC | 12/04/2012 |
| 4. | METHOD AND SYSTEM FOR PHYSIOLOGIC CONTROL OF AN IMPLANTABLE BLOOD PUMP | 8323173 | US Granted Patent | MICROMED TECHNOLOGY, INC. | 12/04/2012 |
| 5. | Blood flow calibration system i.e. blood flow meter programming system, has flow system allowing computer to determine calibration data, and programmer transferring calibration data from computer to memory of flow meter | 8190390 | Derwent World Patents Legal | LYNCH, MORELLO, GINO, BRYAN, BENKOWSKI, MICROMED TECHNOLOGY INC, ROBERT | 05/29/2012 |
| 6. | DEVICE, METHOD, AND SYSTEM FOR CALIBRATION OF A FLOW METER USED IN CONJUNCTION WITH A VENTRICULAR ASSIST DEVICE | 8190390 | US Granted Patent | MICROMED TECHNOLOGY, INC. | 05/29/2012 |
| 7. | Implantable blood pump system such as ventricle assist device (VAD) system has processing device programmed to determine flow rate based on pump parameters and compare determined flow rate to measured flow rate | 580534 | Derwent World Patents Legal | MICROMED TECHNOLOGY INC | 11/25/2011 |
| 8. | Remote data monitor for heart pump system | 1812094 | European Patent Organization International Patents | MICROMED TECHNOLOGY, INC. | 08/17/2011 |
| 9. | Wireless heart pump control system for pediatric application, has motor controller to transmit digital representations of pump motor operating parameters to monitor module through bi-directional radio frequency link | 1812094 | Derwent World Patents Legal | MICROMED TECHNOLOGY INC | 08/17/2011 |
| 10. | Blood pump system e.g. ventricle assist device system, controlling method for recovered heart patient, involves controlling pump in response to flow waveform in time and frequency domains and maintaining desired flow rate | 7951062 | Derwent World Patents Legal | MICROMED TECHNOLOGY INC, MORELLO, GINO F. | 05/31/2011 |
| 11. | BLOOD PUMP SYSTEM AND METHOD OF OPERATION | 7951062 | US Granted Patent | MICROMED TECHNOLOGY, INC. | 05/31/2011 |
| 12. | Blood flow calibration system i.e. blood flow meter programming system, has flow system allowing computer to determine calibration data, and programmer transferring calibration data from computer to memory of flow meter | 7856335 | Derwent World Patents Legal | | 12/21/2010 |
| 13. | DEVICE, METHOD, AND SYSTEM FOR CALIBRATION OF A FLOW METER USED IN CONJUNCTION WITH A VENTRICULAR ASSIST DEVICE | 7856335 | US Granted Patent | MICROMED TECHNOLOGY, INC. | 12/21/2010 |
| 14. | Detecting ventricular collapse in patient with implanted blood pump by sampling pump current, speed or flow rate to calculate suction probability index | 60334677 | Derwent World Patents Legal | MICROMED TECHNOLOGY INC, MICROMED TECHNOLOGY, INC. | 12/09/2010 |
| 15. | SYSTEM FOR DETECTING VENTRICULAR COLLAPSE | 1469770 | European Patent Organization International | MICROMED TECHNOLOGY, | 10/27/2010 |

| | | | | | |
|---|---|---|---|---|---|
| | | | Patents | INC. | |
| 16. | Detecting ventricular collapse in patient with implanted blood pump by sampling pump current, speed or flow rate to calculate suction probability index | 1469770 | Derwent World Patents Legal | | 10/27/2010 |
| 17. | Pump system | 4288174 | Japan International Patents | MICROMED TECHNOLOGY INC | 07/01/2009 |
| 18. | Controlling implanted blood pump by changing pump speed according to change in diastolic pump flow rate and heart rate | 4288174 | Derwent World Patents Legal | | 07/01/2009 |
| 19. | Controlling implanted blood pump by changing pump speed according to change in diastolic pump flow rate and heart rate | 100500230 | Derwent World Patents Legal | | 06/17/2009 |
| 20. | BLOOD PUMP SYSTEM AND METHOD OF OPERATION | 7396327 | US Granted Patent | MICROMED TECHNOLOGY, INC. | 07/08/2008 |
| 21. | Blood pump system e.g. ventricle assist device system, controlling method for recovered heart patient, involves controlling pump in response to flow waveform in time and frequency domains and maintaining desired flow rate | 7396327 | Derwent World Patents Legal | | 07/08/2008 |
| 22. | A blood pump and the blood pump transplant assembly | 4077902 | Japan International Patents | NASA US NAT AERO ADMIN, MICROMED TECHNOLOGY INC | 04/23/2008 |
| 23. | Implantable rotary blood pump e.g. for assisting pumping of human heart | 4077902 | Derwent World Patents Legal | NASA, UNITED STATES GOVERNMENT, AS REPRESENTED BY ADMINISTRATOR OF NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, MICROMED TECHNOLOGY INC, MICROMED TECHNOLOGY, INC., NASA US NAT AERO & SPACE ADMIN | 04/23/2008 |

3509722.5

I. Another piece of MMT's intellectual property are PCT Filings, which are patent applications filed with the World Intellectual Property Organization pursuant to the Patent Cooperation Treaty:

| No. | Title | Patent Number | Type of Document | Application Date |
|---|---|---|---|---|
| 1. | Rotary blood pump i.e. left ventricular assist device, has flow straightener assembly formed with body contour such that rear section of straightener body blends into shaft without forming axial gap between end of straightener and front hub | 2009073494 | Derwent World Patents Legal | 06/11/2009 |
| 2. | DEVICE, METHOD, AND SYSTEM FOR CALIBRATION OF A FLOW METER USED IN CONJUNCTION WITH A VENTRICULAR ASSIST DEVICE (English); DISPOSITIF, PROC%21ED%21E ET SYST%22aME POUR L% 21ETALONNAGE D'UN D%21EBITM%22aTRE UTILIS%21E CONJOINTEMENT AVEC UN DISPOSITIF D'ASSISTANCE VENTRICULAIRE (French) | 2009094207 | US PCT Filing | 01/23/2009 |
| 3. | DEVICE, METHOD, AND SYSTEM FOR CALIBRATION OF A FLOW METER USED IN CONJUNCTION WITH A VENTRICULAR ASSIST DEVICE (English); DISPOSITIF, PROC%21ED%21E ET SYST%22aME POUR L% 21ETALONNAGE D'UN D%21EBITM%22aTRE UTILIS%21E CONJOINTEMENT AVEC UN DISPOSITIF D'ASSISTANCE VENTRICULAIRE (French) | 2009094207 | US PCT Filing | 01/23/2009 |
| 4. | Blood flow calibration system i.e. blood flow meter programming system, has flow system allowing computer to determine calibration data, and programmer transferring calibration data from computer to memory of flow meter | 2009094207 | Derwent World Patents Legal | 01/23/2009 |
| 5. | ROTARY BLOOD PUMP (English); POMPE SANGUINE ROTATIVE (French) | 2009073494 | US PCT Filing | 11/26/2008 |
| 6. | Implantable blood pump system such as ventricle assist device (VAD) system has processing device programmed to determine flow rate based on pump parameters and compare determined flow rate to measured flow rate | 2008124696 | Derwent World Patents Legal | 04/07/2008 |
| 7. | BLOOD PUMP SYSTEM (English); SYST%22aME DE POMPE SANGUINE (French) | 2008124696 | US PCT Filing | 04/07/2008 |

J. All of the patents generally are for technology called HeartAssist5®, which is an implantable electric pump designed to assist patients suffering from serious heart failure.

K. **MMT Assets**. MMT has about $2.3 million in inventory (book value after removing obsolete inventory) for production and maintenance of HeartAssist5® devices, primarily at its Houston location. It owes about $3.175 million in supplier and other accounts payable.

L. **Bridge Notes.** MMC is the maker of certain Convertible Bridge Note(s) dated September 14, 2011 made to the order of the lender pursuant to certain Note Purchase Agreements dated September 14, 2011 between MMC and each lender. Each Bridge Note was secured by a lien on substantially all of MMC's assets.

M. Based upon statements of one Bridge Note holder, MMT believes that one of its two competitors would be willing to pay perhaps $1.1 million for the technology, leaving perhaps $300,000 or more in liquidation value of MMT's other assets.

N. **Foreclosure Sale.**  The Bridge Notes are in default due to non-payment. Two of the Bridge Note holders, Bryan Edwin Lynch and Anthony Williams, provided notice of a public foreclosure sale on April 24, 2013 under their Bridge Notes and the associated Security Agreements.  The notice explained that the proceeds recovered by the foreclosure sale, after payment of expenses, would be shared by all Bridge Note holders on a *pari passu* basis.

O. On April 24, 2013, Lynch and Williams foreclosed their security interests in MMC's assets, credit bid their debts, and assigned the assets to an entity called BTVAD, LLC ("BTVAD").  Lynch and Williams had formed BTVAD.  BTVAD has borrowed about $400,000 to finance its activities.  As a result of the foreclosure, BTVAD is now the owner of MMC's assets for the benefit of the Bridge Note Holders.

P. **Stockholders Meeting.**  As a result of the change of ownership due to foreclosure, the two remaining directors of MMT, David Mackstaller and Ray Bernal, directed notice of a special meeting of the Bridge Note holders, effectively as the new stockholders of MMT.

Q. At a meeting on May 13, 2013, a majority of the stockholders (Bridge Note holders) met in person or by proxy.  They voted on two questions.  They approved reducing the MMT board of directors to one person, and they elected Dennis Winans as the sole director.

R. **Bankruptcy Filing.**  In order to proceed with the transactions described in this Agreement, Mr. Winans as director has determined a voluntary chapter 11 bankruptcy filing by MMT is required.

S. **Going Concern Prospects.**  There are two material competitors to the HeartAssist5® technology.  The ability to sell the device in Europe has value, but even more valuable is the opportunity from the FDA to conduct an Investigational Device Exemption (IDE) Clinical Trial study of the HeartAssist5® LVAD System compared to the HeartMate II® VAD.

T. The first leg of this trial will involve completing devices for implantation in patients in Houston and intensive monitoring of the devices and patients during the trial. The IDE allows the HeartAssist5® system to be sold for use in a clinical trial approved by the FDA to collect safety and effectiveness data before it grants a license to market HeartAssist5® commercially.  This license is known as a Premarket Approval ("PMA") of the product.  The IDE route is the same pathway used by the two main competitors- Thoratec's HeartMate II and HeartWare's HVAD.  Management anticipates obtaining a PMA may result in a going concern.

U. In addition to the funding from BTVAD, it is necessary to raise between $10,000,000 and $15,000,000 to gear up for sales in Europe, begin the first leg of the

FDA trial to bring HeartAssist5® to the market in the United States, and to pay vendors for development and regulatory agency support.

V.      **Proposed ReliantHeart Transaction.**  MMT lacks the capital to bring its technology forward, and its financial difficulties make its reputation a negative in the market.  As a consequence, subject to director recommendation and stockholder approval, MMT intends to sell all of its assets to ReliantHeart, through a plan of reorganization.  ReliantHeart was incorporated and wholly owned by BTVAD on April 9, 2013.

W.      During the week of May 27, BTVAD conveyed its interest in ReliantHeart to Rodger Ford, Bryan E. Lynch, Sailesh Saxena, Anthony Williams and Cindy McKelroy.

X.      MMT contemplates that its plan of reorganization will provide that ReliantHeart will pay cash to MMT's creditors and distribute a portion of its stock to MMT shareholders.  It is initially expected that unsecured creditors will be paid in full, without interest, over 5 years in agreed upon installments.  Bridge Note Holders will collectively be paid $1,100,000 by ReliantHeart, with each holder having the option to convert the debt into equity.  ReliantHeart will raise funds via conversion of the BTVAD loan to equity and an offering to the Bridge Note holders (stockholders of MMT), then to MMC shareholders.  If shares remain unsold, they will be offered to new investors.

Y.      **Approvals.**  Management believes that obtaining consent to transfer the European and FDA approvals to ReliantHeart will take a minimum of 45 days.

## Agreements

1.      **Background Information.**  The parties adopt the foregoing Background Information as true and correct.

2.      **Management.**  From and after Bankruptcy Court approval of this Agreement, ReliantHeart shall, at its own expense:

    2.1.    **Employees.**  Employ all of MMT's employees and compensate them according to law;

    2.2.    **Business.**  Take all steps reasonably necessary to continue MMT's business, including strict compliance with FDA regulations and similar European requirements concerning the HeartAssist5®, Conquest Controller, and Remote Monitoring System;

    2.3.    **Intellectual property.**  Protect MMT's intellectual property, including patents, patent applications, trademarks and copyrights, including payment of all ongoing registration and fees and the fees and costs of MMT's intellectual property counsel;

2.4. **Lease.** Comply with all requirements of the lease with SL Interchange, LP ("Landlord") which was assigned by MMT to ReliantHeart effective April 10, 2013;

2.5. **Utilities.** In addition to Internet service, which ReliantHeart is already paying for, assume responsibility for MMT's utility services;

2.6. **FF&E.** Use, maintain and replace MMT's furniture, fixtures, and equipment in good order, condition and repair in the ordinary course of business,

2.7. **Inventory.** Use MMT's inventory for the production, repair or replacement of the HeartAssist5®, Conquest Controller, and Remote Monitoring System, and replace inventory in the ordinary course of business;

2.8. **Taxes.** Pay all taxes associated with MMT's business operations;

2.9. **Insurance.** Maintain commercial general liability insurance against claims for personal injury, bodily injury, death or property damage, crime insurance, employment practices liability insurance, worker's compensation insurance, umbrella liability shall be written on no less than a follow form basis (no more restrictive than the underlying insurance) with a Limit of Liability of not less than $5,000,000 each occurrence and in the aggregate, all naming ReliantHeart and MMT as insureds;

2.10. **Expenses.** Pay all expenses associated with the business of MMT under ReliantHeart's management;

2.11. **Lien Free.** Maintain MMT's property free and clear of liens, claims or interests arising out of events occurring on or after the date of this Agreement;

2.12. **Bankruptcy.** Take all steps necessary for MMT to remain in compliance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules of the District of Delaware, orders of the Bankruptcy Court and Guidelines of the United States Trustee;

2.13. **Reporting.** Promptly notify MMT upon becoming aware of any actual or threatened litigation matters, violations of law and defaults under third party contracts relating to MMT's business, in each case to the extent occurring during the Term;

2.14. **Confidential information.** ReliantHeart shall maintain all information obtained from or on behalf of MMT as its confidential proprietary business information, which may not be used or disclosed except to the extent necessary to perform ReliantHeart's obligations under this Agreement, including preparation of a plan of reorganization and disclosure statement and raising funds required under the proposed plan.

2.15. **Books and records.** Maintain accurate and complete books and records of account and provide MMT reasonable and convenient electronic access to all books and records; and

2.16. **Indemnification**. To the fullest extent permitted by law, ReliantHeart shall indemnify, protect, hold harmless and defend MMT and its Affiliates, and all of their respective officers, directors, shareholders, members, employees, agents, successors and assigns from and against any claims, liabilities, liens, suits, judgments, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from (i) the gross negligence, fraud or willful misconduct of ReliantHeart. ReliantHeart's obligations pursuant to this Section 2.16 shall survive Termination.

3. **ReliantHeart's Business.** During the term of this Agreement:

3.1. ReliantHeart shall not conduct any business other than operation of MMT's business.

3.2. ReliantHeart shall not make any distribution or dividend to any insider or affiliate of ReliantHeart during the term of this Agreement.

4. **Authority.** Without MMT's written agreement, and, where applicable, Bankruptcy Court approval, ReliantHeart shall not have the authority to bind MMT to any contract or obligation, pledge MMT's credit, borrow any money, or dispose in one or more transactions of all or any material portion of MMT's assets.

5. **Plan of Reorganization.** ReliantHeart shall cooperate with MMT in preparation of a plan of reorganization and disclosure statement to accomplish the reorganization of MMT in accordance with the Bankruptcy Code, Bankruptcy Rules, Local Rules of the District of Delaware, orders of the Bankruptcy Court and Guidelines of the United States Trustee.

6. **MMT's Obligations.** During the term of this Agreement, MMT shall:

6.1. **Cooperation.** Cooperate and reasonably comply with ReliantHeart's requests for information, books and records.

7. **Bankruptcy Court Approval.** MMT shall seek approval of this Agreement by an order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

8. **Term.** The term of this Agreement shall commence on the first date it is approved by the Bankruptcy Court. This Agreement shall terminate on the earlier of (a) any termination date provided herein, (b) consummation of a transaction between MMT and ReliantHeart pursuant to a confirmed plan of reorganization, (c) the failure of the

Bankruptcy Court to approve of this Agreement at a final hearing for approval of this Agreement, or (d) other order of the Bankruptcy Court.

9. **Payment.**  ReliantHeart shall pay MMT $50,000 per month as a non-refundable management fee, without offset or deduction.

10. **Limitation of Liability.**  NO PARTY HERETO SHALL BE LIABLE TO ANY OTHER PARTY HERETO FOR ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY, TREBLE, INCIDENTAL, SPECIAL OR INDIRECT DAMAGES except to the extent that any of the foregoing described damages are claimed against a Party or its indemnitee parties by a third party, and such Party is entitled to indemnification from the other Party hereto pursuant to Section 2.16 with respect to such third-party claim.

11. **Default.**  Failure to comply with a material provision of this Agreement shall be a default, which shall become effective 10 days after written notice of the alleged default (an "Event of Default").

12. **Termination.**  This Agreement may be terminated by either party in its discretion effective 30 days after written notice of termination is provided.

13. **Rights Upon Termination.**  If this Agreement terminates for any reason other than consummation of a transaction between MMT and ReliantHeart pursuant to a confirmed plan of reorganization or other order of the Bankruptcy Court, then:

13.1.  No sums shall be due to ReliantHeart from MMT;

13.2.  ReliantHeart's indemnification and hold harmless obligations shall survive termination of this Agreement;

13.3.  All rights, approvals, consents, contracts, inventory or property of any kind or description then owned or later obtained by ReliantHeart shall be conveyed at MMT's direction and in MMT's discretion to MMT or its successor free and clear of all liens, claims or encumbrances, without payment due from MMT or its successor.

14. **Late Payments; Interest.**  If a Party fails beyond any applicable cure period to make any monetary payment to the other Party required to be made in accordance with and subject to the terms of this Agreement, then the amount owed to the non-defaulting Party shall accrue interest at an annual rate equal to the "prime rate" of interest announced from time to time in the "Money Rates" section of the Wall Street Journal plus three percentage points, from and after the date on which such payment was due.

15. **No Assignment.**  Neither Party may assign this Agreement without the prior written consent of the other Party, which may be withheld in the Party's sole

discretion.  Any assignment which is not in compliance with this Section 15 shall be void and shall constitute an Event of Default.  If a non-assigning Party consents to an assignment by the other Party of its interests hereunder, any subsequent assignment shall require the express approval of the non-assigning Party.  No assignment by a Party shall relieve such Party of, and such assigning Party shall remain responsible for, all of its liabilities and obligations under this Agreement.

16. **Waiver.**  The waiver by either Party of a breach of any provision of this Agreement by the other Party does not constitute as a waiver of any subsequent breach.

17. **Governing Law.**  This Agreement shall be governed by and construed in accordance with Arizona law.

18. **Dispute Resolution.**

18.1. **Arbitration of Disputes.**  If the parties cannot settle any disputes or grievances between them in an informal and expeditious fashion, all such grievances or disputes, except those for which either party seeks a remedy in equity, shall be submitted to final and binding arbitration.  Arbitration will be conducted in Tucson or Phoenix, Arizona.  Arbitration shall be initiated by the initiating party giving notice to the other party of its intention to arbitration.  This notice shall contain a statement setting forth the nature of the dispute, the amount involved, if any, and the remedy sought.  The dispute shall then be submitted to an arbitrator mutually selected by the parties.  To the extent feasible, the parties shall select an arbitrator with experience in the operation and management of medical businesses.  If the parties are unable to agree upon the selection of an arbitrator within seven calendar days after a notice of arbitration is given, then the arbitrator shall be selected in the manner provided for by the Arizona Uniform Arbitration Act.  The arbitrator and the parties shall schedule a hearing promptly and the arbitrator shall render a decision no more than 60 days after such arbitrator's selection.  Any decision and award of the arbitration shall be final, binding and conclusive upon the parties.  Costs of the arbitration shall be shared by the parties.  All other aspects of this binding arbitration shall be governed by Arizona Uniform Arbitration Act unless the parties agree otherwise at the time.

18.2. **Attorneys' Fees.**  If either party brings an arbitration (or equitable action as permitted above) regarding any dispute arising out of this Agreement, the non-prevailing party shall pay all reasonable attorneys' fees incurred by the prevailing party in connection with such arbitration or action.

18.3. **Alternative Dispute Settlement Techniques.**  Should the parties, prior to submitting dispute to arbitration, desire to use other impartial dispute resolution techniques such as mediation, the parties may do so as agreed upon at the time.

19. **Notices.** Notices, statements and other communications to be given under this Agreement shall be in writing and delivered (a) by hand as evidenced by a receipt, (b) sent by certified or registered mail, postage prepaid, return receipt requested, (c) sent by Federal Express or other similar receipted overnight delivery service, or (d) by electronic communication (with a simultaneous copy by first class mail), in each case at the address set forth below or at such other address as from time to time designated in writing by a Party. Any such notice which is properly hand-delivered, sent by receipted overnight delivery service or sent by U.S. mail, return receipt requested, shall be deemed delivered on the date indicated on the receipt, if it is delivered on or before 5 p.m. on a business day, and if not, then on the next business day or, if delivery is refused, on the date on which it is so refused.:

MicroMed Technology, Inc.  
Attn. Dennis Winans, Director  
Email: dwinans3@cox.net

ReliantHeart, Inc.  
Attn. Rodger Ford  
Email: RFord@anthem-equity.com  
8965 Interchange Drive  
Houston, Texas 77054

with a copy to:

Robert M. Charles, Jr.  
**Lewis and Roca LLP**  
One S. Church Avenue, Suite 700  
Tucson, Arizona 85701-1611  
Email: RCharles@LRLaw.com  
Facsimile: (520) 879-4705

20. **Entire Agreement.** This Agreement constitutes the entire understanding of the Parties with respect to the subject matter herein. Any and all previous agreements and understandings between the Parties regarding the subject matter of this Agreement are superseded by this Agreement.

21. **Severability.** If any provision of this Agreement is deemed invalid, illegal, or unenforceable in any jurisdiction, then that provision will be ineffective to the extent of the invalidity, illegality, or unenforceability, without affecting the remaining provisions of this Agreement.

22. **Amendment.** This Agreement may not be modified or amended except by an agreement in writing signed by the Parties.

23. **Expenses.** Each party is responsible for its expenses incurred in regard to the negotiation and drafting of this Agreement.

24. **Headings.** Headings of sections are inserted only for convenience and are in no way to be construed as a limitation on the scope of the particular Sections to which they refer.

25. **Counterparts.** This Agreement may be executed in counterparts, and all counterparts so executed together will constitute one and the same instrument.

| MicroMed Technology, Inc., | ReliantHeart, Inc., a Delaware corporation |
| a Delaware corporation | |

By _____    By _____
Its _____    Its _____